Sefcovic v. TEP Rocky Mountain and this docket is 19-1120. Take a moment here for us. We're ready to hear your argument. May it please the court, I'm Nathan Keever, I'm here for the appellants, the objectors below, the Gonzaleses and the Bonds. We've asked you to review a class action settlement that is extremely unique. It's a settlement where the plaintiffs are paying the defendants substantially more than they would have ever been able to receive under the claims that were originally made. And it starts from the concept of the original Lindauer settlement where these subclass two and subclass three parties or category two and category three leases under the new subclass one had fought originally against Williams to say you cannot take these gathering deductions. And Williams agreed in that original settlement to pay back the gathering deductions that had taken back in 2009. I thought that they agreed to disagree. No. Essentially they said you can deduct them and we can sue you for deducting them. No, if you look in the record on page 1639, I believe it's lines 13 through 16, the expert who is the expert in the original action as well clearly states that those royalty owners were repaid for those gathering amounts at that time. Then the question in that original action was what are we going to do going forward? And the parties were not able to agree what they would do going forward. In other words, from 2009 on. But they were repaid for everything that had been taken up to that point. Then there was this period of time where the operator did not take those deductions. Then a successor came in, that was WPX, and began sporadically taking some deductions from some individuals. And then recently TEP steps in and not only decides it's going to take these deductions, it's going to take those deductions. It's nonsense. Would it be fair to say there was a dispute about what proper gathering expenses were? For those individuals, yes. That would be proper to say. Hotly contested dispute? Well, in the 2009, they agreed to pay the amounts back. And we agreed, all right, as long as you don't take them, there won't be a dispute about it. If you start taking them again, then royalty owners, you get to challenge it. It doesn't say that, though, does it? It does say that. I mean, it says you can challenge them, but does it say that you had sort of this, if you don't take them, we're fine. If you start taking them, then you get to challenge it. Doesn't it just say, you know, we're not coming to any conclusion on these, and in the future you can challenge? You see what I'm saying? Is it as specific as you just said it is? It's pretty close, 4.2. I mean, it pretty much says you can take them, but if you take them, we can challenge. Okay. Right. That's what it says. But what you're interpreting is the underlying agreements, right? That's right. And the underlying agreements contemplated that TEP could take deductions regarding transportation of natural gas from, quote, the mouth of the well to the point of sale. And so that's what ultimately is the ambiguous term everyone's trying to interpret, right? Well, no. At the time of the 2009 settlement and in that settlement, if you look at 1.15, if you look at the definition of deductions, there was a clear distinction between gathering and transportation. Gathering is that stuff that happens locally prior to the gasping process. Transportation happens down the mainline pipelines. But that's not what the testimony was, right? I mean, there was clearly a dispute about the interpretation of transportation and gathering. In which case? Well, Ms. German testified, right? Right. Okay. And at the fairness hearing, she said that she thought that the category, that the right, subclass one, had a very weak claim based on her interpretation of gathering. Yeah, but she testified to that. That's correct. Okay. So there was some dispute about what was encompassed in gathering, what was encompassed in transportation, and what the subclass would be entitled to. Is that fair? At some point there was a dispute, and it didn't come up, even in the second action, until their second amended complaint, which was filed 21 days before that fairness hearing. So there wasn't a dispute in terms of was the Lindauer settlement breached originally. It came up because TEP said, well, if we're going to pay back these breaches under the Lindauer settlement, then, hey, we want you to agree to close this gap here, this thing we were not allowed to do without challenge under the original settlement agreement. You've got to agree to this amendment. And so 21 days before they filed a second amended complaint, after notices provided after the opt-out period, they filed this thing saying, we're going to amend the Lindauer settlement to allow these deductions that previously could have been challenged. And the effect that has is substantial on those subclass one members, because not only did it let them keep the deductions they had just started taking again, it let them say, well, when WPX was there, we could recoup those, too. We're going to apply that amount to this other amount. So they got to take those, too. And it said, and from now in perpetuity, we can take those deductions. So they recouped. By the day of the distribution of this settlement, they had already recouped all of the settlement amount from the subclass one leaseholders, all of it. They were ahead of the game. That's what's so inappropriate about this settlement and how odd it is. And, you know, if you look at, well, why didn't anybody object sooner, sooner than 21 days before the fairness hearing? How do we even know what these people are doing? You know, they've negotiated this deal that hammers the subclass one. They have no class representatives who represent the Category 2, 3 people on a real basis, you know, where they really have an emphasis. For example, if you have multiple leases, if you're a large leaseholder, they may have gotten some benefit from their subclass 2, subclass 3, subclass 4. But the subclass one people, the people that just have that, all they got was killed under this deal and continue to. Some of them haven't received royalty payments for months because they owe TEP. That's the settlement. Of 607 class members, only four objected. Is that right? That's correct. Of some of those that didn't object, were they subclass one? Absolutely. And you know why they didn't object? Take a look at the notice. The notice doesn't say, we're going to give you a dollar today, and then you owe us on the day of distribution $10. It doesn't say that. There's no indication anywhere that they owe TEP anything. You can't figure that out from the notice. You can't even figure it out from the statements that were made. They didn't even know at the fairness hearing how much was owed. When did TEP go from $0.21 to $0.59? Class counsel, I don't know. They don't even care how much it's going to be. Could you tell from the settlement, the proposed settlement agreement? What's that? If you looked at the proposed settlement agreement, could you tell about recoupment? No. If you look at 9A and 9B, you can't tell the amounts. You can't tell how that's going to affect you. If you're a royalty owner, you can't tell that. How do you ultimately tell, then? What's the first tip-off? Well, you'd have to look. One of the questions is, how much did they not take that they now say they can take? That requires forensic accounting. The person who was able to figure out how this was going to affect the subclass one owners was the accountant who testified at the fairness hearing how outrageous this settlement agreement is. It'd be like if you got a notice in a class action, we're going to send you $10, but they don't tell you, you owe us $100. Weren't these owners represented by counsel? The royalty owners that signed off? At what point? I don't know. I'm asking. I mean, they're absentee class members. So, you know, they're supposed to be being represented by the class representatives who had a conflict here. They're supposed to be. The class representatives, though, did testify, and that seems to be sort of the real gist of the argument is, those class representatives, do you really have any real objection to the testimony as to the fact that had they chosen not to settle, they were facing a huge risk of being potentially worse off? No, they couldn't be worse off. There wasn't a counterclaim here for these damages. They couldn't have been worse off in this case, the way the case was pled. They would have been better off had these claims never been brought in that second amended complaint. They couldn't be worse off. And Ms. German even said she knew they were worse off. She said, basically, well, it's good for the group as a whole. Well, no, it's good for the group as a whole if you're not in subclass one. If you're in subclass one, it's not good, and it never will be good because they amended the Lindauer settlement. And when you were talking about where this should be, it's part of the reason that it's nice to keep it in the same court. The original court would have understood what was happening here, would have understood that original agreement. Wasn't it a different judge in state court? Do I have that wrong? No, the original judge that heard the motion of enforcement, and she's still presiding, Judge Lynch, was the judge in the original settlement. The other party that should have been there just briefly is the magistrate. They had a fiduciary duty to do something here and to set out the findings and to address these issues that were raised. That didn't happen. Nobody was watching out for these people, and they got sold out. Did you challenge the adequacy of the representation below? Of the class representatives, yes. You did? Yes, and the judge ruled and said they're adequate but didn't say why, didn't make any findings to support that. You made these arguments? What's that? You made these arguments below? Yes. Well, the judge ruled that it was the representative was Ms. German, right? Yes. And the judge ruled that she was a member of subclass one, correct? Yes. And so she was adequately positioned to represent that subclass? Well, she did not hold a Category 3 lease, but neither do any of your clients. None of the objectors own a Category 3. That's correct. But we're not saying we're representing everybody. We're saying these people are sold out. And she also said and admitted that this was just good for the whole, that she wasn't there watching out for subclass one. She had other leases too, and she was looking at those rather than how it would just affect this. And they got an incentive payment. So it didn't wipe that out. So you're saying they were sold out, but they're not saying they were sold out. Well, that individual did not say she was. Well, she knew that her subclass one leases were sold out. She thought it was okay that my class one leases, which were a minor part of her holdings, were sold out for the good of the whole. Well, she also testified. I mean, it was more than that. She also testified that she thought the subclass one argument was very weak. She testified to that. That's correct. Okay. I mean, one of the things that's difficult is that we look at these things under what are called the TINEL factors, a four-factor test, and it really seems to be at odds with how it was briefed. But, you know, so when I'm looking at that, you have to consider all of those things, whether there was an argument, the strength of the argument, whether there was something to be gained by settling, adequate representation. We look at whether other members of the class opted out and are objecting. All of those things go into the assessment of whether the settlement was reasonable. Well, I would say if you looked at the case that was actually litigated back in 2009, those people got paid. So you can't say they got paid all the deductions that were taken. So you can't say it had no value, that it was worthless. And there's a pending action trying to deal with those same claims now as well. So you can't say that just because one class representative who we feel had a conflict of interest because she had such a small interest in that anyway, that testimony controls the rest. And I'd like to reserve a teeny bit of time, if I may. Thank you. May it please the Court. I'm George Barton, arguing on behalf of the appellees for this appeal. I want to reference specifically the types of royalty instruments that were involved in Category 2 and Category 3, the subclass 1 leases. Just to emphasize the fact that there were 306 leases that were part of subclass 1. Approximately 91% of those leases, which were 278 leases by number, were leases that expressly provided that the producer, WPX, had the right to deduct all of the costs of transporting the gas from the mouth of the well to the point of sale. So that was the predominant royalty provision in subclass 2 and subclass 3. But isn't there a dispute about what transport means? Well, actually, there was not. I mean, there was a dispute from the standpoint of the objectors. Well, that's what a dispute is. Well, yes, there was a dispute. But ultimately, because of the Lindauer settlement in Section 4.2, it specifically permitted WPX to deduct all deductions that it claimed it was entitled to take under the language of that royalty provision. So starting in 2009, WPX and later TEP, they consistently took, for the subclass 1 members, they took deductions for gathering. They took deductions for fuel. And they took deductions for processing. And they reflected those deductions on the royalty check substatements that were sent to the members of subclass 1 all the way from 2009 until we filed the Sefcovic action without anybody objecting, without any member of subclass 1 objecting to those deductions that were being taken. But under the Lindauer settlement, they had a right to object, right? They had a right to object. And they could wait for as long as they didn't run out of statute of limitations, they could later come in and say we're exercising our right under the Lindauer settlement to sue for reimbursement of these expenses you've improperly withheld from our royalty checks. That's right. They had a right to challenge. So it really came down to, in terms of the strength of the claims that we were asserting, you had to look at the language of that royalty provision. And the testimony was from the witnesses that testified, both Mr. Simpson, he testified that what you're talking about here is there's three legs of transportation in the natural gas industry, and the first leg of the transportation process is transporting the gas from the mouth of the well to the inlet of the processing plant. And the only way that you do that is through a gathering system. That's the only way it gets done. So trying to construct an argument as to how you could convince a court that under that royalty provision that the gathering cost deductions were exempted from that, were not part of that, were not part of the process of transporting the gas from the mouth of the well to the inlet of the plant, we found to be very challenging. That that was a claim that was likely, in reality, that would be very difficult to prevail on. So that's because of the language, not so much from the word transporting, but because of the from the mouth of the well to the point of the sale. Exactly. That 91% that contained that language, that was the problem. That is correct, Your Honor. You can disagree, if it hadn't had that language, you could disagree about what transporting meant. That's right. And only three of the leases had customary transportation charges as opposed to mouth of the well to the point of sale. And, you know, that was the essence of what we were trying to deal with. And so what we did, we evaluated all, you know, we looked at what all the dollar numbers were for the gathering deductions, for the fuel deductions, and fuel is really part and parcel of the gathering. It's just the fuel is used to run the compressors so that because you have to compress the gas when it's being transported from the mouth of the well to the inlet of the plant. So we had a very challenging claim there. But we looked at all of these and we made a very, we had a very long-winded negotiation with the counsel for TEP, Mr. Crispin, about how are you going to resolve this in a way that's fair and reasonable. And their position was, look, under the plain language of this royalty provision, we prevail on the gathering cost. We prevail on the fuel cost. But notwithstanding that and notwithstanding the challenges we had in trying to, you know, trying to get any recovery on that claim, we focused in on, okay, you've got processing cost deductions, which are disputed, but which are not part of the transportation from the mouth of the well to the point of sale. So we ultimately got a settlement where not only did they agree to pay 50% of the processing cost deductions that they had been taking with respect to the subclass one members. In addition to that, they also agreed to pay 40% of the fuel cost deductions. So that amounted to a settlement of $454,000, which we believed that the class representative for subclass one who testified at the hearing believed was a fair and reasonable settlement because of that, the express language of that royalty provision, which was the prominent royalty provision, the predominant royalty provision. Let me interrupt. Yes, sir. Looking at, I understand what you're saying about the weakness of the claim, but the recoupment part of it, according to Mr. Kiever, when this settlement was executed and the notice was given that you're going to receive this much, in fact what was happening is because of the right of recoupment, they were actually going to owe money. Is that correct? It's not correct at all as to subclass one. And Mr. Simpson, who testified at the fairness hearing, specifically addressed that. He was asked on direct examination, and he was the accountant for TEP, their accounting expert who looked at all of the royalty accounting data, and he specifically was asked that question. What did you determine as to what impact the recoupment had on the members of subclass one? And he testified in his direct examination that it was less than $1,000. And we said in our brief, our response brief, there's just no validity to that. And that's what Mr. Simpson's testimony was with respect to that subject. As the person who was the most knowledgeable about all of this royalty accounting, he had had a chance to look at that, and he simply did not support that. That was not true. He said it was less than $1,000. That was his testimony that was in our response brief. Less than $1,000 per claimant or less than $1,000 as compared to the $444,000 settlement amount? No, it was less than $1,000 impact on the subclass one as a whole. And do you have a record site? I do, Your Honor. I believe it is, I have it right here, it's 1629. Question, now with respect to just subclass one, do you know how much of that total $275,000 is associated with potential recoupment of overpayments to subclass one owners? Answer, on page 1629, what I saw was less than $1,000 related to subclass one. That was his testimony at the final fairness hearing. So there was substantial testimony presented both through Ms. German, who testified about the weakness of this royalty provision, which was accurate, that we were facing serious questions of fact and law, and that's ultimately what Magistrate Hegarty recognized in his order approving the final approval. There's one other thing I want to say here. This whole issue about category three, which was part of subclass one, it's true that the category three royalty instruments had a provision also said mouth of the well to the point of sale, but it further provided that such transport services are provided by a third party. But the evidence was that all of these gathering services were in fact being provided by third parties. And the objectors did not raise this issue of a purported conflict of interest involving these category three leases being part of subclass one in any of the briefs that they filed with respect to it. And they filed three of them. They filed three briefs prior to the final fairness hearing. The first was filed on November 6, 2018, appendix 1022 to 1035, February 4, 2019. That's not in the appendix, but it was document number 124. They filed a third brief with respect to their objections filed on February 19, 2019, and that was appendix 1379 to 1399. Not once in any of those briefs did they make any allegation that there was a conflict of interest between the class representatives for subclass one and the category three royalty owners. They didn't make any allegation as to that. At the final fairness hearing, they didn't make any allegation as to a conflict of interest between the White River and Sefcovic as the class representative for subclass one and these category three royalty owners. It was never raised. And as we said in our brief, the issue was simply waived. Had the evidence, had the issue been properly raised, what we would have submitted in the evidence at the hearing was that, first of all, we had looked at all of these written agreements between WPX or TEP and these gathering services. They were all third parties. The only thing they ever said about it was after all of the evidence was presented at the final fairness hearing, Mr. Keever made a contention that for some of these third party gathering service providers, there was an affiliated relationship between Williams and one of the third party service providers, which was Williams Field Services. But the facts with respect to that were that that affiliated relationship existed for only six months out of this eight-month time period of the claim period, which started in July of 2011 and extended to June of 2018. After June... You're telling us your argument you would have made had they raised this objection, right? That is correct. So it's really not relevant at this point because it's not in the record, right? Well, the issue was never properly raised. I understand, but I just want to make sure I'm understanding that you're making an argument now that you didn't have a chance to make below.  But I'm just trying to clarify the facts. The facts were that this affiliated relationship between Williams and its affiliate ended at the beginning of January 2012 because Williams was spun off from its affiliate as of early 2012. So from that point forward, all of the gathering services were being provided by third party entities that were not affiliated with Williams or TEP. And I say that because there simply was no basis for the contention that there was a conflict of interest between the class representatives, that being Sefcovic and White River as the class representatives for subclass one and those royalty owners who had those category three royalty instruments. And it was never properly raised. And so the district court had no basis to make any evaluation of that issue that was never argued except for a passing reference at the very end of the evidence at the class certification hearing without submitting any evidence on the issue. So I'm just trying to clarify what the facts were with respect to that issue because that was a major issue that they raised in their opening brief. The remaining issues that exist here, I would tell you this settlement was a good settlement. I mean, the TEP agreed to pay 50 percent of the processing cost deductions that had been taken. They had an argument that they had the right to take the processing cost deductions. They agreed to pay 40 percent of the fuel cost deductions. All of that added up to $454,000 for subclass one, even in light of this difficult royalty provision. And not only that, with respect to the future, they agreed to disagree back in 2009. But at this point, they entered into a settlement agreement that permitted TEP to take the gathering and fuel deductions, which they always said under this royalty provision they had an absolute right to take. And frankly, there's no case anywhere that I've seen that would suggest otherwise. But they also agreed to limitations on their processing cost deductions because unlike in the Lindauer settlement agreement, they now agreed to be subject to a limitation under which they could only deduct an amount of processing cost deductions, which was the same as what the Category 5 royalty owners are getting, where they get they're limited to a processing cost deduction, which is one-third of the value of the natural gas liquids. So what was in Lindauer is paragraph 4.4, which applied to the Category 5 leases, now became going forward as part of this settlement, that section 4.4 limitation now also applies to the subclass one royalty owners. That's a benefit to them. At the point of settlement, TEP was taking processing cost deductions that were far beyond the 4.4 limitation, which they said arguably we have a right to do that. So we negotiated a settlement that provided benefits to the subclass one settlement class members that was a very good and reasonable settlement in light of the reality of the plain language of the royalty provisions that were at issue, and it also provided significant benefits going forward because they now are bound by the section 4.4, which had previously only applied to Category 5. So it was beneficial in that respect also. Quickly, I'd like to respond to the issues about the notice. You need to sum up, though, because you're over time. Oh, I didn't realize that, Your Honor. I will stand on our briefs with respect to the issues of both the notice and the scope of the relief. Thank you. Thank you. And I believe counsel is out of time, but we'll give you a minute 30 because that's how much counsel went over. But you need to stick to it. That's very generous. The record cite that they cite as to TEP's expert is incorrect, and if you take a look at that, you'll see that that is not what he was speaking to. In fact, what he says when questioned about it is, I don't know. I don't know how much these people are going to owe right now at this point. Also, class counsel's expert that was called Don Finn, I don't know. I don't know. The only person in that room that said they knew how much was Mary Ellen Denomy, the expert for the objectors, who was also the expert in the previous case that said these people are about to get hammered, and that's in the record. And they got hammered and haven't gotten royalty statements because they're still paying TEP. All of this could have been summed up for you, including their new argument, if there had been a rigorous analysis by the magistrate. He just didn't do a rigorous analysis. He keeps saying rigorous analysis, which is the standard for class certification, not for approval of a settlement agreement. It's a different test. It is, but he has to analyze the settlement agreement, and he has to look at it and make specific factual findings so that it's clear as to the basis of why this is a fair settlement in his mind. That wasn't done here. If this matter is remanded because this court finds the settlement agreement was not fair as a result of this disproportionate impact to subclass one members, counsel will have their opportunity to make their additional arguments they want to make. We will. There will be a full record on the matter. And that's what we ask this court to. Thank you. Thank you both for your arguments. Very helpful. The case is submitted.